Your Honor, this is Mark Perry for Aventis. There are two appeals and cross appeals and so forth. We were assuming Amphastar wanted to go first, but we'll hear it however the court would like to hear it. That's appellants. But Amphastar is the appellant, so on your docket, that's Mr. On our docket it says Aventis is defendant's appellant. We were the appellant in the first appeal, Your Honor, and if Amphastar is the appellant in the second appeal, it doesn't matter to me either. We're happy to allow them to go first. All right. Aventis has graciously agreed that you can go first. That's Amphastar. We're Aventis, Your Honor. Oh, okay. There's too many A's in this case. Too many appeals and cross appeals. Okay. So you're Amphastar. No, Your Honor. So this is the attorney's fee issue, is it not, for you? Maybe I could start by setting the table, Justice Scanlon. Okay. Very well. May it please the Court, my name is Mark Perry. I represent Aventis. Okay. Which is the defendant in the underlying False Claims Act suit and the victor of the judgment of dismissal. So we won the case. There are four issues before the Court. First, whether the underlying fraudulent allegation or transaction was publicly disclosed. On that issue, my colleague, Mr. Gross, for Amphastar, is the appellant, and we are responding. The second issue is if it was publicly disclosed, was Amphastar an original source of the information. That's the one on which we had a hearing in July of 2014. Judge Garbus made extensive findings of fact that Amphastar was not an original source, and we won that as well. And on that issue, Mr. Gross and Amphastar is the appellant. There are two other issues. One is, did Amphastar give the government notice of the so-called information that it claimed to be an original source of the experiments it conducted in 2000 through 2002 before filing suit? That was an interlocutory appeal that we filed several years ago, and the Court accepted. That is, we are happy, frankly, to submit that one on the paper since it's moot on the other two issues. The fourth and final issue is the attorney's fees, which we believe that Aventis is entitled to, given the resolution of the case and the vexatiousness of this litigation. Again, however, we would be happy to submit that one on the papers because I believe the two important issues before the Court are Amphastar's appeals on public disclosure and original source. With that said, I am happy to discuss both of those issues or have Mr. Gross discuss them. I would like you to discuss the attorney's fees a little bit because I'm inclined to affirm. So I wanted to give you the opportunity to persuade me otherwise if you think that would be beneficial. But if you want to submit on the papers, that's fine with me as well. I'd be happy to address the attorney's fees, Your Honor. The standard for attorney's fees under the False Claims Act is whether the defendant prevails in the action and whether the claim was clearly frivolous, vexatious, or brought for purposes of harassment. Judge Garbus, the district court judge here, did not reach the second prong, that is the vexatiousness and so forth, because he ruled on the first prong that Aventis was not the prevailing party. And the reason for that was this Court's precedent in the Branson v. Knott case, which had held that a jurisdictional dismissal does not confer prevailing party status for purposes of attorney's fees provision. Your Honor, two reasons. First, this Court has two lines of jurisdictional dismissal precedence. Branson v. Knott, where the question is jurisdictional standing, this Court has a separate line of cases, the Alaska Right to Life case being a good example, that a dismissal for standing-related jurisdiction or jurisdictional standing does not preclude an award of attorney's fees. And here, the False Claims Act jurisdictional provision that we're litigating is a standing requirement, not an Article III, the case can never be in federal court requirement. So under this Court's own precedence, under Alaska Right to Life, the Court was wrong. Second... Your Honor, none of this was briefed to Judge Garbus. He reached the attorney's fees issue sua sponte at the conclusion of his opinion, because we had litigated the original source issue, he issued his opinion, neither party addressed attorney's fees in the briefing below. The second reason he was wrong is the Supreme Court's intervening decision in CRST, which makes clear that a non-merits dismissal is sufficient to convert prevailing party status on a party. All non-merits dismissals, it doesn't matter whether they're jurisdictional or otherwise, and the Supreme Court made clear in that case that prevailing party should be construed consistently across federal law, including the civil rights statutes and the FCA. And the third and final reason I would offer today is... Before you move away from the CRST case, didn't the Supreme Court in that case, though, decide then, after deciding, well, you can still, even if you are prevailing based on the jurisdictional issue, even though you're found prevailing, even though you were dismissed out on a jurisdictional issue, you can still look at the merits of whether or not it was a frivolous case or not in making that determination whether to award attorney's fees. And that appears to be the analysis that the district court judge made in their opinion. Your Honor, I would agree that the holding of CRST is that any kind of a dismissal then kicks the inquiry into the second phase, which is frivolousness and vexatious and so forth. I would disagree respectfully that Judge Garbus ever made that analysis here. What he, what Judge Garbus did in the opinion at ER 87 to 88 was he cited the Branson versus not, no prevailing party rule, and then he said, quote, I am unable to say whether or not he ever conducted the inquiry as to whether the litigation was vexatious or frivolous. And our request, of course, is not reverse and render, but rather vacate that order, send it back to Judge Garbus for an analysis of vexatiousness and frivolousness in light of CRST and Alaska Right to Life. Counsel, may I ask, what do we do with our Zambrano case? Your Honor, Zambrano and that line of cases that hold that particular statutes may not authorize attorney's fees where there is a jurisdictional dismissal go so far as the statutes they involve. Here, the only case at the appellate level that I'm aware of and that either party has cited to deal with that question under the False Claims Act is the Greenberg case, G-R-Y-N-B-E-R. And in that case, the court held that in the False Claims Act, Congress did authorize fees following a jurisdictional dismissal under the public source bar. And the reason is very simple. In 1986, when Congress amended the False Claims Act, it simultaneously added the public disclosure bar and the attorney's fees provision. And the attorney's fees provision for defendants was intended to enforce the public disclosure bar. So your position is that we can look to Greenberg, which is a Tenth Circuit case, notwithstanding the fact that there's language in Zambrano which might cast some doubt about that? Well, Your Honor, again, Zambrano is not, as I recall, in fact I know is not a False Claims Act case. It is an Equal Access to Justice Act case. And what each case, and the court in footnote 10, I believe, of the Branson case made very clear, is that each statute has to be evaluated on its own terms. There is no blanket rule that a jurisdictional dismissal precludes or allows attorney's fees. And the question is, under the False Claims Act, this court has never decided the fees are not available, and the only appellate decision is the Greenberg case. So this court could either follow Greenberg, in which case fees are awardable, or create a circuit which would be, we submit, unfortunate and unnecessary, because it would conflict with the plain language and intent of the statute, as well as the logic, frankly, of the CRST decision. The CRST did not involve the False Claims Act either, right? CRST involved Title VII, and the language, however, Your Honor, prevailing party carries through all of these statutes, and CRST Supreme Court. Let me apologize. I created an ambiguity, if you will. As to prevailing party, each statute should be construed, each attorney's fee statute should be construed the same, and the Supreme Court said that in so many words in CRST, and it had previously held that in the Bruckhammer case that we cite in our reply brief. As to Judge O'Scanlon's question, that is, whether a jurisdictional dismissal under a particular statute precludes an award of attorney's fees in its own right, that is, notwithstanding the language of the statute, that, this court has made clear in Branson itself, must be evaluated under the terms of the particular statute at issue. And the court illustrated that, for example, in the tax cases where, you know, the court had successive decisions in the Latch case and then the Spons case, in which it decided it different ways under actually different provisions of that statute, so that it's not a one-size-fits-all rule for that. So I apologize if I was unclear, Judge Rawlinson, as to which statute should be applied uniformly. There are no further questions on attorney's fees. I'm happy to turn to another issue, or Mr. Groscoe, or... I'm still struggling with your reliance on CRST. Do you think the Supreme Court specifically addressed the situation where a case is dismissed for lack of subject matter jurisdiction? Your Honor, with the possible, and I say possible, exception of Rooker-Feldman type outside of Article III altogether cases, yes, and I think... Tell me the language that I should be looking to to satisfy myself that the Supreme Court expressly addressed the situation where a case is dismissed for lack of subject matter jurisdiction. Well, Your Honor, to be clear, subject matter jurisdiction was not at issue in CRST. What was at issue was a non-merits dismissal, and there was a line of cases that came up to the Supreme Court in CRST. There was a circuit conflict in which this court was on one side and some other courts were on the other side of whether a defendant is a prevailing party if the dismissal is not on the merits. What Branson says is that a jurisdictional dismissal is not on the merits, and therefore you're not a prevailing party. That part of the case is not on the merits, and therefore you're not a prevailing party. Well, what about that? Because I think non-merits ruling is broader than dismissal based on subject matter jurisdiction. I agree with Your Honor 100 percent. Our cases precisely address subject matter jurisdiction, and I don't know if that broad umbrella was actually focused in on the subject matter jurisdiction dismissal. Judge Rollins, let me put it this way. The Supreme Court said every non-merits dismissal counts for attorney's fees. Jurisdictional dismissal is a non-merits dismissal. That's the holding of Branson. Therefore, it is a subset of that broader set that the Supreme Court has ruled on. The Supreme Court made no distinction, nor could it have, because the logic of CRST, and I'm going to get that name wrong every time. The logic is when the defendant has got the case dismissed from the court, it has achieved its objective. It doesn't matter whether it's on the merits, on jurisdiction, or on any other basis. Getting the case dismissed is the defendant's objective. The problem is that we have our own precedent, and unless the Supreme Court has expressly overruled our precedent, we're bound by it, unless the holding of our case is clearly irreconcilable with the Supreme Court case, and I'm having difficulty getting there. Two answers to that, Your Honor. First, you have your own precedent that includes Alaska right to life, which says, in so many words, a jurisdictional dismissal does not preclude an award of attorney's fees, and the only way to reconcile Alaska right to life line of cases with the Branson line of cases is that standing is a quote-unquote jurisdictional dismissal, but a standing-based dismissal still counts for an award of attorney's fees, and that's consistent with CRST. The second answer, Judge Rawlinson, is Greenberg. In Branson, the court clearly held that each statute has to be considered on its own terms, and Greenberg, from the Tenth Circuit, very clearly explains that a jurisdictional dismissal under the False Claims Act, that is a public disclosure bar dismissal, gives rise to attorney's fees for precisely the reason that Congress enacted these two provisions of the statute at exactly the same time. In fact, they follow each other in the statute, and each provision is designed to enforce the public disclosure bar, and to read it as Judge Garbus and my colleagues at the other side of the aisle would read it, would render that congressional determination absolutely relevant, and there is no precedent of this court that stands in the way, because this court has never construed the availability of attorney's fees in a public disclosure bar dismissal case. So this is the first time it's come up. We have Alaska right to life from this court. We have CRST from the Supreme Court, and we have Greenberg from the Tenth Circuit, all pointing in favor of the availability of fees. There is no case pointing against fees, other than Branson, which is an oddball Ricker-Feldman case, and the line of cases that is at least suspect under CRST, and in any event doesn't involve the False Claims Act. So there's nothing from this... It's the language in Alaska right to life that you rely upon. Excuse me. Oh, I apologize, Your Honor. It is... I see. 852, a court may award attorney's fees and costs even after dismissing for lack of jurisdiction. That's correct. Well, the analysis is in the holding, Your Honor. The case was dismissed for lack of standing, and the court did reverse and remand for an award of attorney's fees. So not only did the court have that sentence that says, as a general matter, a court may award attorney's fees and costs even after dismissing for lack of jurisdiction, but the court then, the holding of the case is, it reversed the denial of attorney's fees and sent it back. Right, but normally we have a little bit of discussion about why that... Conclusion is the correct one, and how we arrived there. Your Honor, that's correct. And again, I will point the court to footnote 10 of Branson, and then the... But I was asking you about Alaska right to life, because you relied on that case. I was wondering what the analysis was that could help us in deciding, you know, whether or not we should stick with Zambrano, or whether or not it's been overruled. So I was just curious what the language was. Well, I would stick with that, and again, I would go to Greenberg, again, from the Tenth Circuit, but Greenberg very carefully analyzed the Branson case from this circuit, because the plaintiff in Greenberg, which is the only False Claims Act case on this question in the Courts of Appeals, the plaintiff in that case made exactly the same argument that Amphistar makes here, which is that Branson v. Knott and this jurisdictional dismissal rule precludes an award of attorney's fees, and the Tenth Circuit squarely rejected that as a construction of the False Claims Act, because these two statutes, these two provisions were enacted at the same time, and the attorney's fees provision is a enforcement mechanism for the public disclosure bar. So, you know, the only time it's ever come up in a Court of Appeals in the context of this statute, we have one well-reasoned, very thoroughly reasoned, in fact, decision from the Tenth Circuit, explaining exactly why fees are available and analyzing it, Judge Rawlinson, using this Court's precedent as the starting place. So I think it's a useful, as you look for an analytical approach, if you will, a methodological approach, I would commend Greenberg to the Court. Thank you, Counsel. Did you want to address the other issues at all? I don't want to preclude you from doing that, if you'd like. Your Honor, I'm happy to address them. I'm shooting a little bit in the dark, since we haven't heard from Amphistar. You might want to save your time for rebuttal on the attorney fee question. I don't want to manage your time for you. Your Honor, I wouldn't want to leave unaddressed the rest of the issues in the case. I will speak very quickly, then, on this. Public disclosure. This Court gave us the guidance in Metesky. Mr. Gross will talk about it. The only bad act in this case, so-called bad act, is the single error in Example 6. The very first page of the introduction to the first brief in this Court filed by Amphistar says, quote, this appeal stems from a knowing fraud perpetrated by Aventis on the PTO, end quote. Okay, that's the allegation. And that allegation carried through from 2004 to today. And that's why there was a public disclosure, and that's what Judge Garbus held. And it's as simple as that. This is an easy case under Metesky, ALCAN, and A1 Ambulance. Then we get to original source, public disclosure being the threshold, original source being the door that Amphistar tried to walk through. We had a trial on the merits that lasted a week, setting aside the misconduct and lies and other shenanigans that went on that are still the subject of sanctions proceedings. The Court made findings of fact at the end of it that Amphistar never developed this product, as it said. And that factual finding is not challenged by Amphistar on appeal. End of story. If those two things are affirmed, Your Honor, the government notice issue becomes moot, and the only question becomes attorney's fees. And I will reserve the remainder of my time. Thank you. Good morning, Your Honors. Wayne Gross for Amphistar. May it please the Court. I'd like to go right to the dispositive issue, which is public disclosure. Because if you find, as I'm going to say you should, that the public disclosure bar was not triggered, we'd never get to attorney's fees. We'd never get to original source issues. The public disclosure bar in Metesky, which is the most recent analysis by this Court of what public disclosure bar means, said basically that the purpose of the public disclosure bar is to distinguish between whistleblowers who provide valuable information to the government, and then the other type, which sometimes are pejoratively called whistleblowers, is parasitic and opportunistic. Haygood, another older opinion of this Court, described the appropriate whistleblower as follows. One who sounds the alarm rather than simply echoing it. And in this case, it is beyond dispute that Amphistar sounded the alarm regarding the massive Medicare and Medicaid fraud scheme being carried out by Aventis. They're the ones who, in the False Claims Act case that they filed under SEAL in 2009, told the government for the first time that Aventis was defrauding Medicare and Medicaid. And the way they were doing it was through egregious price gouging. The only public disclosure that had occurred prior to that time was that Amphistar was a fraud. That 2009 False Claims Act case was five years earlier in the patent litigation between Aventis and Amphistar, where in a counterclaim, my client Amphistar introduced new and different bad act information, which is that they lied to the patent office to get their patent in the first place. They also, in that counterclaim, alleged that after they got that bogus patent, they improperly listed it in the FDA orange book, which delayed generic companies like Amphistar from getting approval to manufacture a generic. That was the prior disclosure. There was no reference whatsoever to any claims to the government, much less receiving money from the government. Much less overcharging the government. And so with your de novo review standard, you have the opportunity and the responsibility to make sure that that limited public disclosure does not prevent Amphistar from proceeding on the merits. As you know, the government in this case looked at it for a couple of years, decided not to intervene. It's still supportive. As you know, the government filed an amicus in connection with a motion to dismiss, but Amphistar, standing in the shoes of the United States, is the only entity that is going to be able to bring Aventis to justice. Here's what happened in the court below that led to the improper triggering of that public disclosure bar. I don't think, before you spend time on that, I think the main issue at the court below was whether or not your clients were the original source of that public disclosure. Well, that was a big issue, you're right, but before you even get to original source, you first have to determine whether there's a public disclosure. Counsel, could you please remain stationary? We are video, so it's really difficult to get moving around. Right, so what I was saying was before you even get to that original source hearing, which should never have occurred, the court has to determine whether there was a triggering public disclosure. And what happened was the controlling Ninth Circuit law, Horizon West, was provided to the court, but the court misapplied it because, as Aventis does now, Aventis misled the court. So the court misapplied it, and the court misapplied it to the district court regarding what Horizon West means. But what did the district court determine in terms of the public disclosure? Correct. The district court acknowledged that the counterclaim made no reference to Medicare, Medicaid, any government claims, any overcharging. Nonetheless, the district court said, based on the enough-to-investigate language of Horizon West, that that was enough. Right. And that was wrong. Okay. And this is what it all comes down to. In Horizon West, there were a couple of different prior disclosures. It involved a nursing home, actually many nursing homes, in which the foundation for the elderly alleged that there was substandard care. And so a couple of things happened. Number one, these nursing homes, because they wanted to have Medicare and Medicaid pay for the services, had to do what's called patient surveys. And in those patient surveys, when the patients filled out those forms, it revealed that there was substandard care. And so they then, the foundation, filed a lawsuit in Yolo County in which they alleged substandard care. But neither in those patient surveys, nor in the Yolo County lawsuit, was any mention made of Medicare or Medicaid. And so what then happened is the foundation, just like Amphistar did here, filed a False Claims Act lawsuit against the same nursing homes. But in that False Claims Act lawsuit, what they said, which they didn't previously say, was those nursing homes had to pay for the services. Those nursing homes got Medicare and Medicaid money, and therefore it was a False Claims Act violation. The district court in that case, just like Judge Garbus here, looked at the prior disclosures, those patient surveys, the lawsuit, and said, actually focused on the patient surveys. That's enough. Those patient surveys allege substandard care. This False Claims Act lawsuit alleges substandard care. Case over. Public disclosure. Horizon West said no. Horizon West, in defining what investigate or enough to investigate means, said you have to, and this is on 1015, it said, quote, what is conspicuously missing from that complaint are any allegations of substandard care. That is, that the named defendants misrepresented the level of care to the government and received payment for the alleged substandard care. So there was not enough under those same exact circumstances to find that there was a public disclosure. And think about it. If you have... The first disclosure was about substandard care provided to the occupants of the nursing home. And the second disclosure was about misbilling, or overbilling, or overcharging. Well, it's actually, there's a little confusion that Aventis tries to take advantage of. You're absolutely right that in the first sentence, Judge Tashima said, that appellants filed this qui tam action alleging that appellees defrauded the United States by receiving payments from Medicare and Medicaid for care which was not given. And that's what I think you're referring to. We're still talking about Horizon West. This is Horizon West. Yeah, to me, I see a difference between asserting substandard care to the residents of the nursing home, nothing to do with how people are charged. I see a separate assertion that, by the way, the government is being overbilled for these patients. I see those as two separate things. Tell me how the facts in this case analogize to those two separate allegations. Okay. Let me just clarify one point, if I may. In footnote six of Horizon West, it says that the second amended complaint specifically alleges instances of substandard care. Against 17 defendants. Which means that the Yolo County complaint, the previous one, as I mentioned, alleged substandard care. And then the False Claims Act case alleged substandard care. But I thought the False Claims Act case added to that the component of the fraudulent charges. Yes. That's exactly right. And that's why there was no public disclosure. Just like in this case, there is no public disclosure. That's why I'm trying to get you to help me see the analogy. What's the first finite allegation that's made? And what's the second finite allegation that's made that's different than the first one? So in both Horizon West and in this case you have... I don't want to talk about Horizon West. I want to talk about this particular case and what are the two finite allegations that were as different as the allegations were in Horizon West. Got it. The predicate wrong in this case was Aventis having one of its chief scientists, a guy named Dr. Ouzon, submit false declarations twice, 2003 and 2004. To get a patent that it never should have had. Fraud on the patent office is the allegation. Well, it's inequitable conduct, but I see it that way, too. It's a bad act. But that bad act, as despicable as it is, and it was, is very different from what next happened. But didn't that include some allegations that charges were made differently, or the monopoly charges were made... And you're absolutely right. So here's the distinction. In the patent litigation counterclaim, they also alleged that because after getting... Aventis getting the bogus patent and then improperly listing it with the FDA, they delayed generics from entering the marketplace. And so they got monopoly power, but there was no allegation whatsoever about monopoly pricing. And those are two very different things. In stark contrast, in the False Claims Act, later False Claims Act case, they talked about monopoly pricing, because by then it was determined that not only did they get their monopoly and control 100 percent of the market, that's... If you're a bad monopolist, that's what you do, but you could be a super bad monopolist by not only controlling 100 percent of the market, but skyrocketing prices. Let me ask you this. Did the first allegation assert that generics were being prevented from entering the market? Yes. Isn't that the implication then? Because it's generally known that generics are cheaper than brand. So wouldn't that raise enough information to the government that there is a pricing component here? No, because there are a number of leaps between getting the bogus patent, delaying generics from entering the market, and then what you have to do is the following. Just because you get FDA approval doesn't mean that you automatically get Medicare approval. You have to apply separately to CMS, and then they determine whether you get approval for those drugs. So that's one leap. And by the way, there's a lot of drugs, weight loss, symptomatic cough and cold medication, which is covered by the FDA and not covered by Medicare. So we're talking about a particular drug here. It's a new, it was a new drug at the time. What we're talking about is looking at the prior disclosure, which was that counterclaim, in a vacuum, because that's the only public disclosure that you juxtapose with the False Claims Act case. And so going back, if we're just looking at that and nothing else, which is quite frankly what would happen if I were a False Claims Act litigator, as I was at the U.S. Attorney's Office. If I had that, I would be looking at that. And you know what I would be looking for? False claims. And that's why the Horizon West case controls. But as a prosecutor, you look at the ramifications of what's put before you. You don't have blinders on. The prosecutors also look at what are all the ramifications of this, who all can be affected, what agencies can be affected. So let's talk about the additional ramifications. Let's assume for the moment, which was not contained in the prior disclosure, that they did go to Medicare, they did get approval for this new drug. The next step is that they would have to decide, as they apparently did, to charge five times the price of what they charged for the same drug in Europe. That egregious overcharging was not even remotely suggested in the counterclaim when looking at it just in and of itself. In the same way for Horizon West, and this is why I keep going back to it, you have these patient surveys. And think about this. You have patient surveys filled out by elderly people where the elderly people were saying, this is substandard care. The reason they were completing those surveys is because Medicare and Medicaid require nursing facilities to have those patients fill those surveys out. And this is in footnote four of Horizon West. So if I were to talk about being aware of ramifications, if I were a prosecutor and I saw patient surveys that had this substandard care being articulated by the people in the nursing home, knowing that the only reason they filled out those surveys was so that the nursing home could bill Medicare and Medicaid, I would absolutely think to myself, this is a Medicare and Medicaid fraud scheme, but that's not what this court has said. In fact, the court has said the opposite. It said that even that is not enough. What you have to have and what was not present in Horizon West and what was present in A-1 and A-1 Ambulance and in ALCAN is a prior disclosure that makes reference to the claims to the government that trigger liability under the False Claims Act. So, for example, in A-1, and I believe, Judge Wallinson, you were on this, the panel of this case, you had a case where the patient was charged with fraud and transactions, because it can be either allegations of fraud against the government or transactions from which fraud against the government can be inferred. And in A-1, what you had was a series of hearings where it was determined that exclusive ambulance service contracts were going to be given to an ambulance service company, and the counterparts were going to be the counties, were not going to pay for the services provided to the indigent. And so, whoever won the bid as an ambulance company would have to provide services to the indigent and not get paid for it from the county. And so, during the hearings, they also talked about the contracts with Medicare and the maximum allowable rates that Medicare would provide. Not for the indigent, but rather for the beneficiaries of Medicare. All of that constituted a public disclosure, because it was a transaction or set of transactions that revealed that the winning ambulance company would likely inflate prices to Medicare to cover the cost of providing services to the indigent. Let's assume, and not to go back to this, but let's assume that the district court found that you, that there was no public disclosure, or that there wasn't enough there to investigate. So let's assume you're right, that there was no public disclosure. Didn't the district court then make a credibility finding as to the original source? But that's the whole point. And if we look at the original source issue, then it all goes away, because... No, it doesn't. It's the other way around. If there's no public disclosure, you don't even get to the original source determination. If there is a public disclosure, then if the person is an original source, then the public disclosure bar is not triggered. So that's why original source doesn't even need to be part of what you do to resolve this issue. That's why I said the public disclosure bar is absolutely dispositive. And let's talk about quick trigger for a second. As you know, this court in Metesky, which is a court decision that came down this year, indicated, contrary to what Judge Garbus said, that the public disclosure bar is not a quick trigger. It said that this court has not adopted the quick trigger analysis, which is true. And that was a mistake. Well, here's how it helps me. If you decide to adopt it, here's how the quick trigger would apply. You look at this case, and there was no false claims disclosure, and there was in the False Claims Act case. Therefore, you can apply the quick trigger to decide there was no public disclosure. In the same way Horizon West did. Unlike what Judge Garbus did. What he did was he cited to Horizon West, but he misapplied it. Counsel, may I ask you before your time is up here? Sure. Are you familiar with the 10th Circuit decision in NRA National Gas Loyalty? Is that in connection with public disclosure? It's a fairly recent case. I am not, Your Honor. Okay, in conclusion, there's been a lot of recent discussion out in the world about price gouging. In connection with the pharmaceutical industry, and you might think that this is a new concept. It is not. The reason the False Claims Act was enacted 153 years ago during the Civil War is to provide the government and citizens like Amphistar who know about fraud. That's the Greenberg case. I am very familiar with the Greenberg case. If you want me to switch back to that for a second, I'm happy to do so. I'll start on public disclosure and then I'll go to Greenberg. The first thing that you're provided when you get to the U.S. Attorney's Office is a copy of the Springfield decision, which has been quoted by both sides, which traces the history of the False Claims Act, which, as I mentioned, started during the Civil War. And the reason Congress enacted that False Claims Act from the very first day was to provide the government with a weapon, which is citizens who know about fraud. And in that case, it was price gouging in connection with war procurement contracts were being incentivized to come forward with that fraud and work with the government to do something about that fraud. In the same way, Amphistar and only Amphistar could have figured out a 14-year fraud that was massive in scale, billions of dollars. That event is, to this day, is trying to keep for itself. We understand that point, but I wanted to ask you about the language in Greenberg that talks about piecemeal revelation of the information that the relator has. Excuse me, Judge, Ron, would you bring the microphone a little closer? I'm sorry, I wanted to ask about Greenberg and the language that appears to disapprove a piecemeal revelation of the information that the relator has. I'm sorry, I wanted to ask about Greenberg and the language that appears to disapprove a piecemeal revelation of the information that the relator has. On pages 1043 and 1044 of that decision. Are you familiar with that language? Oh, my apologies. I thought you were talking about the Greenberg Tenth Circuit case in connection with attorney's fees. No. And maybe, I'm sorry if I have... It's 562F1032. Is that it? Well, Your Honor, I'm happy to look at it, and I'll tell you my thoughts. All right. It may address attorney's fees, but that was the point I was looking at it for, because it talks about piecemeal revelations and why that should be discouraged, but you don't recall that part of that case? Well, what I will say is this. A person later doesn't have to know about all parts of the fraud, if that's what that case was referring to. A public disclosure doesn't have to include, doesn't have to be identical with the False Claims Act case, and that's what Metesky says. But in order for that prior disclosure to be a public disclosure bar, it needs at least one thing, which is a claim against the government. As bad as defrauding the Patent Office is, and I agree, that was a fraud, it's not a False Claims Act violation. All right. Okay. You've exceeded your time, Counsel. What about the original source issue? Well, I understand why he makes that, since he can't win it. Public disclosure is the threshold, original source is the door. I think the Court's cases, all Court's cases have been very clear on that. There was a public disclosure here. There was a public disclosure of the fraud on, the so-called fraud on the Patent Office, and let me explain why that is central. Horizon West and Metesky and these other cases talk about unrelated frauds. That's a direct quote from Horizon West about that standard of care and the asbestos and so forth. The Court said those were unrelated frauds. You could prove the False Claims Act case without ever saying a word about asbestos. Here, the fraud is not unrelated. We know that because of page 20 of their blue brief, they say it's a related fraud. Elsewhere they call it a predicate fraud, and I'll prove it by making this point, that he will not be able to dispute. They can't prove their False Claims Act case without proving the fraud on the Patent Office. They are one and the same fraud. The only question is the ramifications. That's where we get into the X plus Y equals Z terminology from Springfield Terminal that Mr. Gross explained. And there, the District Court at page ER 114 precisely explained exactly how that applies here, that the allegedly false assertion of the patent exclusivity allowed the charging of monopoly prices, and that was a fraud on the government because they weren't entitled to a patent. That is the entire claim. Your Honor, one, that's wrong. The Supreme Court has said over and over again that monopoly power is the ability to charge super competitive prices. That is the definition of monopoly power. There's a case called NCAA. 468 U.S. at 109 note 38, and there's many other cases. This is not cited in the brief because this is an argument they made for the first time in the reply brief. This court held exactly the same thing, specifically in the context, Judge Rawlinson, of the Hatch-Waxman statute that you referenced in discussing with my colleague in the Kaiser case, 552 F3rd 1033. Again, not in the briefs, this came up for the first time in their reply brief, but it's a good discussion of it. Don't mind me. That would be my response to those points, Your Honor. They cite only, of course, the dissent in Comcast v. Barron, that that proposition in Comcast was rejected by the majority, which held you do have to have a price effect in an antitrust case. And, of course, price impact has always been an element of an antitrust case, so the notion that they weren't alleging price impact in their antitrust counterclaim is, frankly, preposterous. Who would be the motive to not include everything in the original disclosure? Why wouldn't they want to include everything in the original, in your view? Why would Amphistar have withheld the specific information about price? Your Honor, I think they first viewed this as a patent case, they tried to win that case, and they did. Let's give them credit for what they did. They won the patent case. Then they double-dipped. They turned around and filed an antitrust claim based on the same allegations. They lost that one. Then they triple-dipped. They turned around and filed the False Claims Act claim based on the same allegations. They lost that one, too. What happened is they're claim-splitting, Your Honor. They're seriatim litigators trying to take the same core allegation of this so-called misstatement to the patent office. Didn't the district court find that they found the additional information upon which they based the False Claims Act during the litigation of the patent? Your Honor, they clearly found some of it, including their evidence of intent. Of course, that was disclosed in the counterclaim, which is, this was an amended answer and counterclaim filed some time into the litigation. After two things had happened, Aventis had voluntarily disclosed the error to the patent office, and Teva, the co-defendant in the patent litigation, had come forward with its own inequitable conduct counterclaim based specifically on those reissued proceedings. So Amphistar then just copied those. I mean, it's a copycat, copycat, copycat problem. So we're now in the third iteration of copycats. Your Honor, I'm way over. If I could add one more point, and last. I'm sorry. Judge Rawlinson, you asked me on the attorney's piece for the language in CRST that we believe supports our position the best. And I would point the Court to page 1651 of the U.S. Reports, 136, Supreme Court, 1651. The defendant has fulfilled its primary objective whenever the plaintiff's challenge is rebuffed, irrespective of the precise nature for the Court's decision. I've read it. We won. We should get our fees. Thank you to both counsel. The case is argued and submitted. Yes?
judges: O'scannlain, Rawlinson, Marquez